# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
August 25, 2009 Session

## STATE OF TENNESSEE  v. HUBERT GLENN SEXTON

**Direct Appeal from the Criminal Court for Scott County**
**No. 7685     E. Shayne Sexton, Judge**

---

**No. E2008-00292-CCA-R3-DD** - Filed December 7, 2010

---

A Scott County jury found the Appellant Hubert Glenn Sexton guilty of two counts of first degree murder arising from the deaths of Stanley and Terry Goodman.  Following penalty phase, the jury found the presence of one statutory aggravating circumstance, that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, and that this aggravator outweighed any mitigating factors.  See T.C.A. § 39-13-204(i)(6).  The jury imposed sentences of death. Appellant Sexton seeks review by this court of both his convictions for first degree murder and his sentences of death.  He raises the following issues for our review:

I.     Whether the trial court erred in denying a motion for change of venue;

II.    Whether the trial court erred in failing to properly admonish the jury before and during trial;

III.   Whether the trial court erred in failing to adequately voir dire the jury regarding  extrajudicial information;

IV.    Whether the trial court erred in failing to excuse certain jurors for cause;

V.     Whether the trial court erred in admitting allegations of child sexual abuse;

VI.    Whether the trial court erred in admitting testimony regarding the Appellant's willingness and later refusal to take a polygraph examination;

VII.   Whether the trial court erred in admitting statements made by the Appellant's wife;

VIII.  Whether the trial court erred in admitting evidence that was similar to the murder weapon;

IX.    Whether the trial court erred in admitting evidence of an unrelated speeding arrest;

X.     Whether the trial court erred in admitting evidence that Appellant alleges was unlawfully obtained from his vehicle;

XI.    Whether the trial court erred in admitting evidence relating to the preparation of Appellant's IRS tax forms;

XII. Whether individual and cumulative instances of prosecutorial misconduct denied him a fair trial;
XIII. Whether the convicting evidence was sufficient to support his convictions;
XIV. Whether the verdict was contrary to the weight of the evidence;
XV. Whether Tennessee's death penalty scheme is constitutional; and
XVI. Whether the trial court erred in denying the motion for new trial based on cumulative error.

Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P. J., and D. KELLY THOMAS, JR., J., joined.

Larry M. Warner, Crossville, Tennessee, and Leif E. Jeffers, Assistant Public Defender, Huntsville, Tennessee (at trial); James A. Simmons, Hendersonville, Tennessee, and Richard L. Gaines, Knoxville, Tennessee (on appeal), for the Defendant-Appellant, Hubert Glenn Sexton.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William Paul Phillips, District Attorney General, John W. Galloway, Jr., Assistant District Attorney General, and Sarah H. West Davis, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In the late evening of May 20, 2000, Stanley Goodman and Terry Sue Goodman were shot and killed in their home in Scott County, Tennessee. This occurred shortly after B.G., the Appellant's minor stepdaughter, had reported to authorities that the Appellant had sexually abused her. Stanley Goodman, one of the victims, was B.G.'s biological father. The Appellant denied the allegations of sexual abuse and believed that Stanley Goodman was responsible for B.G. falsely accusing him of sexual abuse. The proof at trial showed that the Appellant shot and killed both victims while they were in their bedroom. The Appellant admitted his actions to several witnesses who testified at trial.

**Guilt Phase.**

Hope Tharp, the Child Protective Services team leader in Cleveland, Tennessee, responded to a courtesy request from the Scott County Department of Children's Services

to investigate allegations of sexual abuse of B.G.[1] by her stepfather, the Appellant. During this investigation, Ms. Tharp was apprised that, on May 16, 2000, the Bradley County Department of Children's Services (DCS) was asked to respond to similar allegations B.G. had made to personnel at Black Fox Elementary School. Ms. Tharp interviewed B.G. and B.G.'s mother. As a result of the reports and the investigation, the decision was made to remove B.G. and two other children from the Sexton home. Ms. Tharp instructed members of B.G.'s family to come to her office that day at 4:00 p.m. The Appellant and one of the children in the Sexton home did not come to Ms. Tharp's office.

Ms. Tharp eventually went to the Sexton residence, where she encountered the Appellant for the first time. Ms. Tharp informed the Appellant that B.G. had reported that he had sexually abused her and "on that basis [DCS] had to file a petition for custody since the mother was not believing her." She informed the Appellant that he would have to return to her office to complete necessary paperwork and to be interviewed regarding the allegations. When confronted with B.G.'s allegations of sexual abuse, including forced fellatio, the Appellant denied that any "of that stuff occurred." The Appellant explained that B.G. was getting this information from her sister and her father. The Appellant further stated that B.G.'s father, Mr. Goodman, had telephoned him in February 2000 and had the Appellant listen to a tape. On the tape, Mr. Goodman was telling B.G. to say things related to her allegations against the Appellant. The Appellant stated that B.G. "made all this stuff up. . . she's got it from her dad. . . . he put her up to it."

Bradley County Sheriff's Deputy Jerry Kyle Millsaps[2] assisted Detective Alvarez and DCS regarding the investigation involving the Appellant. Deputy Millsaps observed that the Appellant was upset and was talking with his wife, Sherry Sexton, about "her family causing them problems all the time." Deputy Millsaps also overheard the Appellant state that "he was not going to jail for child charges – a child abuse charge. If I was to go to jail for anything, it would be murder."

On May 16, 2000, Bradley County Sheriff's Detective Tony Alvarez[3] had responded to a complaint initiated by a teacher at the Black Fox Elementary School. Along with DCS, Detective Alvarez spoke with B.G. regarding the allegation. He later spoke with the

---

[1] Consistent with the policy of this Court, minor victims are identified by their initials. See State v. Schimpf, 782 S.W.2d 186, 188 n.1 (Tenn. Crim. App. 1989).

[2] At the time of the Appellant's trial, Jerry Kyle Millsaps was employed as a trooper with the Tennessee Highway Patrol.

[3] At the time of Appellant's trial, Tony Alvarez was employed by the Department of Defense training military police officers for the United States Army Reserve.

Appellant regarding the allegation. Detective Alvarez advised the Appellant of his <u>Miranda</u> rights. The Appellant waived those rights and signed a written waiver to that affect. The Appellant informed Detective Alvarez that B.G.'s biological father, Stanley Goodman, was behind the allegations against the Appellant. The Appellant further advised Detective Alvarez that "[the Appellant and his wife] had been staying up here with the Goodmans. For one reason or another, they decided to transfer back to Bradley County. Mr. Goodman was not too happy about that arrangement. And, as such, he was just getting the children to trump up some false allegations of improper sexual conduct."

Later that week, Stanley Goodman contacted Detective Alvarez. At some point after Detective Alvarez's conversation with Stanley Goodman, Detective Alvarez again met with the Appellant. During this meeting, Detective Alvarez informed the Appellant of his conversation with Stanley Goodman, including Stanley Goodman's intent to file a petition to take custody of the children. Detective Alvarez also asked the Appellant about taking a polygraph test. The Appellant refused to take the polygraph test. The Appellant advised Detective Alvarez that Special Agent Skip Elrod had informed him that such tests could be fixed.

Preston Adams and the Appellant rode back and forth to work together for eight to ten weeks while they worked on a construction project. The Appellant told Mr. Adams of the pending child abuse charges and that the charges were initiated by Stanley Goodman, his wife's ex-husband. The Appellant asked Mr. Adams where he could purchase a handgun. The Appellant told Mr. Adams that "he was going to try to take care of the matter before it could escalate any further."

On May 20, 2000, the Appellant and Mr. Adams went to work around 8:00 a.m. While they were working, the Appellant told Mr. Adams that "[Stanley Goodman] was coming down there and that he hadn't had any sexual contact with the children. And that – but he wasn't going to let him come down there before he took care of that." They left work around 12:30 p.m. The Appellant drove Mr. Adams to the Budget Inn, where Mr. Adams was living at the time. Around 6:00 p.m., the Appellant went to Maxi Muffler to visit with Clinton Daniel Mason, a mechanic at the Cleveland store. The Appellant asked Mr. Mason whether there was any extra work that needed to be done and he asked for his gun, a .22 rifle. The Appellant had purchased the weapon from Mr. Mason the previous year and the weapon was kept at the home of Mr. Mason's mother. Mr. Mason, accompanied by the Appellant, made the trip to his mother's home to obtain the weapon. When they arrived at The Muffler Shop, the Appellant informed Mr. Mason that he had to "take care of some business in Scott County."

Vella Strunk lived near her brother, Stanley Goodman. Stanley Goodman had three children, two daughters and a son. One of the daughters, E.G., lived with Stanley Goodman in Scott County. B.G. and her brother lived with their mother and the Appellant in Bradley County. Every Saturday night, Vella Strunk and her family attended the races in Scott County. E.G. would usually accompany the Strunk family. They would not get back home until sometime after 2:00 or 2:30 a.m. The Appellant was aware that E.G. attended the races with the Strunk family and was also aware that the Goodman home would be unlocked in order for E.G. to get back into the home. On May 20, 2000, E.G. accompanied the Strunk family to the races. Due to rain, the races were cancelled and the family returned home around 8:30 p.m. The Strunks took E.G. to her home around 11:00 p.m. Vella Strunk observed that no lights were on in the house. Vella Strunk remained in her car while E.G. went inside the house to get her some coffee. After E.G. returned with her coffee, Vella Strunk went home.

The next morning, Vella Strunk telephoned her brother, Stanley Goodman. There was no answer at the Goodman residence. Within ten minutes, E.G. telephoned Vella Strunk, crying. E.G. told Vella that her father and stepmother were still in bed and that they had blood on them. Vella Strunk drove to her brother's home where she discovered the bodies of Stanley and Terry Goodman. She then called the police.

Around 3:00 a.m. on the morning of May 21, 2000, Clinton Daniel Mason saw the Appellant and his wife for about ten minutes at their apartment. He described the Appellant as being "drunk or something" and his wife as being upset. Around 8:30 a.m. the same day, the Appellant came to Mason's house and asked Mr. Mason if he and his girlfriend wanted to get something to eat. On the way to Denny's restaurant, the Appellant confided to Mr. Mason that he had killed Stanley Goodman. Mr. Mason stopped the Appellant from revealing any more of the details of the murder.

Around 8:00 or 9:00 a.m., the Appellant and his wife visited Preston Adams at his room at the Budget Inn. The Appellant told Mr. Adams that "the police had been there and ransacked his house. And . . . that he did commit those crimes. . . ." The Appellant told Mr. Adams the following:

> [The Appellant said that] he stopped at the dollar store and he bought a hood and he bought sweats and bought gloves. And he had disposed of all hair follicles off of his body. And that after he had done the crime, he said that he had burnt all the clothes and he said that he burnt the stock of the gun and buried the rifle part. . . .

-5-

He said he bought oversized shoes so that it would like that a bigger man had committed the crime. He also changed the tires on his vehicle, too.

The Appellant told Mr. Adams that Stanley and Terry Sue Goodman were in their bedroom when he killed them.

Christy Swallows lived in the same trailer park as the Sextons and occasionally babysat their children. Ms. Swallows was also involved in an affair with the Appellant. Sometime during the week of May 14, 2000, the Appellant questioned Ms. Swallows regarding the investigation into the sexual molestation allegations. The Appellant told Ms. Swallows that Stanley Goodman had played a tape to him. He stated, "That bastard in Scott County did this." He added that "he would kill him for this." On the morning of May 21, 2000, Ms. Swallows was awakened by the Appellant beating and banging on her windows and doors. She described the Appellant as being frantic and scared. He stated that his wife had left him. He added that her car was at the police station. The Appellant eventually admitted to Ms. Swallows that he had killed Stanley and Terry Goodman.

On Saturday, May 20, 2000, Detective Alvarez received a call at his home from the 911 Center stating that Tennessee Bureau of Investigation (TBI) officers or agents wanted to speak with him because there had been a double homicide in Scott County. On Wednesday, May 24, 2000, Detective Alvarez received a page from 911 that Sherry Sexton was attempting to get in contact with him. He contacted Sherry Sexton and had the conversation recorded. Sherry Sexton sounded desperate. She agreed to meet Detective Alvarez at the south precinct. Detective Alvarez contacted Special Agent Barry Brakebill and advised him of the scheduled meeting with Sherry Sexton. At 11:00 p.m., Detective Alvarez and Special Agent Brakebill met Sherry Sexton.

Thirty minutes into their discussions with Sherry Sexton, Detective Alvarez and Special Agent Brakebill were advised that the Appellant was at the door. The Appellant was upset, agitated, and wanted to speak with his wife. He then informed Detective Alvarez that Sherry was upset and that she did not know what she was saying. Detective Alvarez escorted the Appellant to the side of the building, while Special Agent Brakebill removed Sherry Sexton to another location. Sherry Sexton was transported to a safe harbor home to spend the night. The following day, officers arrested the Appellant for the murders of Stanley Goodman and Terry Sue Goodman.

Detective Wade Chambers discovered six shell casings throughout the residence on the first day. He was unable to determine how many times the victims had been shot. He later returned to the residence and discovered three more shell casings. Dinah Culag, a forensic scientist with the TBI, examined the nine shell casings recovered by the Scott

County Sheriff's Department. Ms. Culag determined that all nine shell casings had been fired from the same firearm. Although she was unable to determine what type of firearm was used, she was able to determine that the firearm was not a revolver.

Dr. Sandra Elkins, Knox County Medical Examiner and Director of the Autopsy Service at the U.T. Medical Center, performed autopsies on the bodies of Stanley and Terry Sue Goodman on May 22, 2000. Dr. Elkins determined that the cause of death of Stanley Goodman was multiple gunshot wounds to the head. Stanley Goodman received "four gunshot wounds to the head, all in the right facial region." Dr. Elkins determined that the cause of death of Terry Goodman was also multiple gunshot wounds to the head.

Based upon this proof, the jury returned verdicts finding the Appellant guilty of the first degree murder of Stanley Goodman and guilty of the first degree murder of Terry Sue Goodman.

## Penalty Phase.

During the penalty phase, the State presented the testimony of Lamance Bryant, a teacher in Scott County. Mr. Bryant testified that Terry Sue Goodman was his sister. He explained that, at the time of her death, she was survived by her mother, two sisters, and himself. Mr. Bryant described his sister as "a very friendly, outgoing person." He said she had a "sweet spirit."

Mr. Bryant described Terry Sue Goodman's injuries from a car accident in 1985 and how she managed to overcome some severe physical hindrances resulting from that accident. He explained that she had to learn to walk and to talk again. As a result of this accident, she was never able to work again; however, she was able to walk without a walker on good terrain. Mr. Bryant stated that, since her death, there has been a void that was not able to be described with words.

E.G., the fourteen-year-old daughter of Stanley Goodman, stated that she and her dad were very close. The two of them spent time fishing and gardening together. E.G. also stated that she was close with her stepmother, Terry Sue Goodman. Since the murders, E.G. suffered from nightmares and had difficulties being alone. E.G. also blamed herself for the murders because the door to the Goodmans home was left unlocked for her. She stated that she no longer felt as if she had a home.

Vella Strunk, Stanley Goodman's sister, testified that she was very close to her brother. She explained that her life will never be the same without him. Vella Strunk verified that E.G. was suffering from nightmares and that she was afraid to be alone.

As mitigation proof, the Appellant presented the testimony of three witnesses. Lynn Sexton, the wife of the Appellant's first cousin and also the first cousin of Sherry Sexton, testified that she had known the Appellant for about twelve to thirteen years. She explained that the Appellant, Sherry, and their three children lived with her for about six months. Lynn Sexton stated that, while his family lived in her home, she had no problems or difficulties with the Appellant. The Appellant eventually moved his family from her home into a trailer park in Winfield in Scott County. The family then moved to Bradley County.

Lynn Sexton described the Appellant as a hard worker. She stated that he was not an alcoholic or a drug user. Lynn Sexton testified that she did not believe that the Appellant was the type of person to commit murder. She described the Appellant as the type of person who would come to someone's aid if needed and the type of person who would listen and give advice to someone with a problem.

Karen Cooper testified that she had known the Appellant since he was three or four years old. She stated that the Appellant did not have a stable childhood environment. The Appellant's parents were not always present. She explained that his parents divorced when he was six years old and that, at the age of seven, he was left with her sister-in-law and her husband. Ms. Cooper added that the Appellant moved a lot when he was growing up and that the longest period of stability that the Appellant had was probably when he lived with her sister-in-law and her husband. She estimated that the Appellant had lived with six to eight different families before he reached the age of eighteen. Ms. Cooper recalled one incident where the Appellant stepped off of the school bus and realized that the family with whom he had been living had moved.

Ms. Cooper related that the Appellant had two older sisters and one younger brother. She also stated that the Appellant's father had been in poor health for several years and had suffered from emphysema. Ms. Cooper said that she believed that the Appellant's father had done the best that he could with the Appellant but that he had been overwhelmed by the entire situation. She conceded that the Appellant's father had not always approved of the Appellant's lifestyle. Ms. Cooper said that she loved the Appellant and believed that he was able to do some good for people. She also stated that the Appellant was "no genius, but he's not stupid either." She added that, in her opinion, the Appellant was not a manipulative person.

As its last witness, the defense presented the testimony of Dr. William D. Kenner, a physician with specialty training in psychiatry, child psychiatry and psychoanalysis. Dr. Kenner stated that he was contacted by the defense to evaluate the Appellant to determine if he exhibited any mental health symptoms. He stated that the Appellant moved approximately twenty-six times before he reached the age of eighteen. He explained that

"one of the things that happens when you take a child and move him around like that is that they lose the sense of attachment that they have with adults. . . ." Dr. Kenner continued:

> . . . One of the . . . way[s] children learn what's right and wrong and what's moral and even more basic things like, you better think some before you act and a sense of trust that I can feel confident that . . . this is a fair and benign world that not everybody is out to get me and things like that. You learn that from the people that you care about. And your caring about them is not just that they are reasonably nice people and treat you okay, but also that you've got time on the job with them, that you have been with them long enough to develop a sense that they're gonna be around in your life and that they're going to be important to them [sic] and you can count on.

He stated that when the Appellant first started school, he was of average intelligence and could work well with others and people liked him. Then the Appellant began moving. He was unable to stay in one place long enough to develop friendships. Dr. Kenner stated that the Appellant was unable to learn how to relate to others. Dr. Kenner testified that the result of the Appellant's childhood experiences was an attachment problem. It was his opinion that the Appellant was unable to form a cohesive sense of who he was.

Dr. Kenner testified that the Appellant's parents were divorced when he was six years old. The Appellant's mother left with another man. He added that the Appellant's father spent six months in an Army psychiatric hospital and later developed some heart disease and chronic lung disease. Because of these health problems, the Appellant's father was unable to hold the family together. Dr. Kenner stated that "one of the things that happens to people when they get hurt psychologically is that they will often repeat that, even though they don't mean to." He explained that this was like the person who has an alcoholic parent. That person makes a pledge not to marry an alcoholic. Dr. Kenner stated that often this person will end up marrying an alcoholic. He described this as "reliving that kind of experience."

Dr. Kenner testified that the Appellant's younger brother suffered from "mental retardation problems." The Appellant's mother favored this child and kept him and sent the Appellant off on several occasions. Dr. Kenner stated that the Appellant was reliving this experience in that the Appellant had a favorite daughter. He explained that people in the Appellant's position normally have very chaotic lives with regard to marriage and employment. They end up repeating for their children the same nomadic-type existence they had.

Dr. Kenner related that a number of the Appellant's relatives have histories of mental illness or substance abuse. He stated that impulsive behavior and mental illness will run in

-9-

families. In families predisposed to mental illness, there will be an increased rate of substance abuse, and the family environment will magnify these problems. Dr. Kenner testified that studies in the 1940s revealed that human attachment and involvement was critical to the well-being of babies.

Dr. Kenner stated that Stanley Goodman represented a threat to the Appellant's relationship with his children. This was "something that's going to set [the Appellant] off big time." He explained that the Appellant had "trouble . . . . holding himself on the road when the going gets rough, when it starts to rain." Dr. Kenner opined that, regardless of the veracity of the allegations of sexual abuse, the Appellant would still fear his children being taken away from him, which would bring up the pain he felt when he lost his family.

Dr. Kenner stated that the Appellant was amenable to rehabilitation and would do well in the prison setting. He explained that prison life provides a type of "family." He stated "you are contained, you know the rules, it's consistent. . . ." He added that the Appellant would be less likely to do harm to someone inside the penitentiary than outside. Dr. Kenner stated that the Appellant would be able to do something positive for society if given a sentence of life over a sentence of death. He explained that, if the Appellant was given a sentence of life over a sentence of death, the Appellant's children would not spend their lives feeling responsible for their father's execution.

Dr. Kenner affirmed that the Appellant does not satisfy the legal definition of insanity. He further agreed that the Appellant does not suffer from a mental disease or defect other than a personality disorder.

The jury retired to deliberate at 12:05 p.m. Deliberations were stopped for a lunch break. At 2:29 p.m., the jury returned to open court with its verdict. The jury found, as to each count of first degree murder, that the proof established the aggravating circumstance that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. The jury determined that the statutory aggravating circumstance outweighed any mitigating circumstances and, therefore, imposed sentences of death for the murders of Stanley Goodman and Terry Sue Goodman.

## I. **Motion for Change of Venue.**

The Appellant alleges that the trial court erred "by conducting the trial in . . . Scott County because of its small population, the saturation of the publicity, and the clear impact this had on the jury venire." Prior to trial, the Appellant filed a motion to change venue to a neutral county with an unbiased and uncontaminated jury pool, which was subsequently denied. In this appeal, the Appellant argues that the trial court erred because the "offenses

had been well-publicized by local and regional media outlets, and had been generally discussed throughout the rural, sparsely populated Scott County (population approximately 20,000 citizens)." The Appellant asserts that many of the prospective jurors had received information through local media sources which was outside the evidence later developed at trial. He contends that the responses by prospective jurors to the jury questionnaires and voir dire reflected undue excitement and other prejudice against the Defendant such that a fair trial could not be had except in another neutral county. He adds that many of the prospective jurors, including jurors who were ultimately selected to sit on the case, knew the victims and their family members, who were life-long Scott County residents. The Appellant additionally complains that many of the jurors personally knew the District Attorney General and the members of his staff who prosecuted the case and/or the Scott County Sheriff and members of his staff who investigated the case. The Appellant contends that these personal relationships with the victims' family and the investigating and prosecuting officials resulted in prejudice to the Appellant. The State contends that the Appellant has failed to show that any of the jurors were unduly influenced by any media coverage or were unable to be impartial.

The decision to grant or deny a motion for a change of venue rests within the discretion of the trial court and will only be reversed by an appellate court upon a clear showing of an abuse of that discretion. State v. Rogers, 188 S.W.3d 593, 621 (Tenn. 2006) (Appendix). A change of venue may be granted "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). When ascertaining whether a trial should be moved to another county, the court should consider the following factors:

1. The nature, extent, and timing of pretrial publicity;
2. The nature of the publicity as fair or inflammatory;
3. The particular content of the publicity;
4. The degree to which the publicity complained of has permeated the area from which the venire is drawn;
5. The degree to which the publicity circulated outside the area from which the venire is drawn;
6. The time elapsed from the release of the publicity until the trial;
7. The degree of care exercised in the selection of the jury;
8. The ease or difficulty in selecting the jury;
9. The venire person's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire;
10. The defendant's utilization of his peremptory challenges;
11. The defendant's utilization of challenges for cause;

12. The participation by police or by prosecution in the release of the publicity;
13. The severity of the offense charged;
14. The absence or presence of threats, demonstrations or other hostility against the defendant;
15. The size of the area from which the venire is drawn;
16. Affidavits, hearsay or opinion testimony of witnesses; and
17. The nature of the verdict returned by the trial jury.

Rogers, 188 S.W.3d at 621-22 (citing State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979)).

In addition to these factors, the court must be mindful that "[t]he mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue." Id. at 621 (citing State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997)). Likewise, "prejudice will not be presumed on the mere showing of extensive pretrial publicity." Id. (citing State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982)). "The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced by the pretrial publicity." Id. (citing State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001); State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)).

In support of his argument, the Appellant cites to the Thursday, June, 1, 2000, edition of the Independent Herald, which reported:

- A spokesman of the Sheriff's Department reported that the Appellant had been the primary suspect from the beginning.
- The victims sustained multiple gunshot wounds to the face with a .22 caliber weapon and were alone in their home when killed.
- Initial interviews with family members led officers to place the Appellant at the top of the list of suspects.
- The Goodmans were to have traveled to Cleveland on Monday to seek custody of Stanley Goodman's other two children.
- One officer reported that the Appellant's wife was cooperating with the investigation.
- Sheriff Carson revealed that Goodman had made child abuse allegations against the Appellant in an attempt to gain custody of the children and the Appellant said he was coming to Scott County to "take care of the problem." He also reportedly told his wife that he had committed the murders.

Following the preliminary hearing, the Thursday edition of the Scott County News reported that the Appellant was bound over to the grand jury for the double homicide and contained the following information regarding the case:

- The State produced testimony of the Appellant's wife and friend indicating that the Appellant had told them both that he had gone to Scott County and killed the Goodmans.
- Cleveland family service worker Hope Tharp's testimony established a possible motive in that she provided detailed testimony concerning allegations of child molestation against the Appellant.
- Deputy Jeremy Kyle Millsaps described his presence at the Appellant's home on May 16, 2000, regarding the alleged child sexual abuse charges.
- Deputy Millsaps testified that he overheard the Appellant and his wife discussing a polygraph examination.
- Clinton Daniel Mason testified that the Appellant told him he killed his wife's ex-husband and current wife.
- Clinton Daniel Mason testified that the Appellant's wife told him that the Appellant murdered the Goodmans.

The Appellant asserts that, through these newspaper articles, many of the prospective jurors received information about the case that was outside the evidence developed at trial. He contends that the responses of the prospective jurors reflected the undue excitement and the prejudice against the Appellant.

In support of this issue, the Appellant refers to the responses of the following prospective jurors listed in detail below: (1) Gerald Lewis, (2) Jeanna Jeffers, (3) Linda Underwood, (4) Thelma Kidd, and (5) Craig Creech.

(1) Gerald Lewis stated that he had "met" the victim, Terry Sue Goodman, through Goodman's brother, Lamance Bryant. He explained that he did not know Terry Sue Goodman well, but stated that "[s]he seemed pleasant when I was around her. . . ." Gerald Lewis stated that the fact that he had met Terry Sue Goodman and knew her brother would prevent him from being fair in this case. The trial court then questioned Mr. Lewis, who clarified his previous statement by declaring, "If I was under oath, I would have to follow the law, but I don't think I could be fair." He added, "I could not be impartial." The trial court excused Mr. Lewis for cause.

(2) Linda Underwood stated that she knew the sheriff. She explained that she was not related to the sheriff and that there was nothing regarding her knowledge of the sheriff that would keep her from being a fair juror in this matter. A peremptory challenge was exercised

against Ms. Underwood. The record fails to indicate which party exercised the challenge. Ms. Underwood did not serve on the jury.

(3) Jeanna Jeffers stated that she knew the sheriff. Ms. Jeffers stated that she knew the victim Terry Sue Goodman and the victim's sister, Sharon Lawson. Ms. Jeffers explained that her relationship with the victim and the victim's sister was that they were acquaintances. Ms. Jeffers further explained that defense counsel had previously represented her son. Ms. Jeffers stated that there was nothing regarding her knowledge of the Sheriff, the Sheriff's Department, the victim, or the victim's sister that would cause her difficulty in serving as a juror in this case. Ms. Jeffers served as a juror. The record reveals that peremptory challenges were exercised after Ms. Jeffers was empaneled on the jury.

(4) Thelma Kidd stated that she knew the sheriff. She stated that she was not related to the sheriff and that there was nothing regarding her knowledge of the Sheriff's Department which would prevent her from being fair in this case. Ms. Kidd stated that she went to school with the District Attorney but did not know him other than just knowing who he was. Ms. Kidd served as a juror. The record reveals that peremptory challenges were exercised after Ms. Kidd was empaneled on the jury.

(5) Craig Creech stated that he used to work with the victim's stepbrother Ray. He explained that he saw Ray in the hallway and asked why he was off work. Ray told him that he was part of the victims' family. The trial court excused Mr. Creech for the communication with the family member.

Other than the two newspaper articles and these statements, the Appellant does not explain how the trial court erred in denying the motion for change of venue. As such, we agree with the State that the Appellant has failed to demonstrate that any juror exhibited bias or prejudice against him based on pretrial publicity. While the record does reflect that prospective jurors were exposed to pre-trial publicity or knew someone associated with the case, "the mere exposure of jurors to newspaper publicity is not constitutional error." Lackey v. State, 578 S.W.2d 101, 103 (Tenn. Crim. App. 1978) (citing Murphy v. Florida, 421 U.S. 794, 798, 95 S. Ct. 2031, 2035 (1975)). "One who is reasonably suspected of a serious crime cannot expect to remain anonymous." Id. (citing Dobbert v. Florida, 432 U.S. 282, 303, 97 S. Ct. 2290, 2303 (1977)). The Appellant has failed to establish actual bias or prejudice of any of the jurors who heard the case. The record shows that the Appellant failed to challenge jurors Thelma Kidd and Jeanne Jeffers peremptorily or for cause. In addition, the Appellant has failed to show that the trial court's failure to order a change of venue was an abuse of discretion. Accordingly, the Appellant is not entitled to relief on this issue.

## II. Failure to Admonish the Jury Before and During Trial.

-14-

Citing Rule 24(f) of the Tennessee Rules of Criminal Procedure, article I, § 9 of the Tennessee Constitution, and the Sixth Amendment of the United States Constitution, the Appellant argues that the trial court failed to adequately admonish the jury before and during the trial. Specifically, he argues that "the prospective jurors were not given any admonishments about their behavior in the week, while they were at home and not sequestered, between their filling out the juror questionnaire and the beginning of voir dire." The Appellant asserts that the "failure to properly admonish the prospective jurors resulted, among other things, in prospective jurors communicating about this case between themselves and with other citizens present in the courthouse."

In response, the State contends that this issue is waived because the Appellant "simply makes a general allegation" and fails to provide any supporting argument, authority or citation to the record. Upon our review, we agree with the State, and conclude that the Appellant has failed to cite to any portion of the record to support his allegation. See Tenn. R. App. P. 27(a)(7). Moreover, the extent of the Appellant's argument is that "[t]he failure to properly admonish the prospective jurors resulted, among other things, in prospective jurors communicating about this case between themselves and with other citizens present at the courthouse." The Appellant fails to specify the "communications" or identify any improper conduct. Consequently, in our view, any notion that the venire engaged in improper conduct or were in any way biased or prejudiced by any communication is mere speculation. The Appellant has not demonstrated any supporting authority for this allegation and is not entitled to relief.

### III. Failure to Adequately Voir Dire the Jury Regarding Extrajudicial Information.

The Appellant also argues that the trial court failed to adequately voir dire the jury regarding the content of extrajudicial information. Specifically, the Appellant contends that eight of the twelve sitting jurors admitted during voir dire to having received extrajudicial information about the case prior to trial. He submits that only one was asked the nature of the prior information. In response, the State contends that the Appellant fails to establish that any juror possessed extra-judicial information.

"The ultimate goal of voir dire is to [ensure] that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). A trial court is granted wide discretion in ruling on the qualifications of the jurors, and a trial court's decision in this regard will not be overturned absent an abuse of discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Unless there has been a clear abuse of discretion, the trial court's discretion is not subject to review. See Lindsey v. State, 225

-15-

S.W.2d 533, 538 (Tenn. 1949). A trial court's finding of impartiality [may] be overturned only for manifest error. Patton v. Yount, 467 U.S. 1025, 1031-32, 104 S. Ct. 2885, 2889 (1984); Howell, 868 S.W.2d at 247.

Rule 24, Tennessee Rules of Criminal Procedure, provides: "If the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case." The rule continues:

. . . Any party may challenge a prospective juror for cause if:

. . . .

(2)     The prospective juror's exposure to potentially prejudicial information makes him unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and if he remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

Implicit in Rule 24 is the recognition that jurors do not live in a vacuum. Because certain cases are by their very nature apt to generate publicity, it may be that some jurors will have formed an impression or opinion concerning the case. In addressing this problem, the United States Supreme Court has observed:

It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 1642-43 (1961). Accordingly, jurors may sit on a case, even if they have formed an opinion on the merits of the case, if they are able to set that opinion aside and render a verdict based upon the evidence presented in court. In interpreting Rule 24, prospective jurors who have been exposed to information which will be developed at trial are acceptable, if the court believes their claims of impartiality. State v. Shepherd, 862 S.W.2d 557, 569 (Tenn. Crim. App. 1992).

In the present case, eight jurors revealed that they had either read or heard something about this case prior to trial. While questions to ascertain the content of any publicity to which jurors have been exposed may be helpful in assessing impartiality, such questions are not constitutionally mandated, and the trial court's failure to delve into the jurors' exposure is not reversible error, unless the Appellant's trial was rendered fundamentally unfair. State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994). The jurors all stated that they had read information in a newspaper. However, each of these jurors also asserted that they could follow the law and the court's instructions thereon. Accordingly, the Appellant is not entitled to relief on this issue.

## IV. **Failure to Excuse Certain Jurors for Cause.**

The Appellant also contends that the trial court erred by failing to excuse certain jurors for cause in violation of Rule 24(b), Tennessee Rules of Criminal Procedure. The Appellant asserts that the trial court should have excused each of the jurors challenged in the previous section prior to trial. Specifically, the Appellant complains that the trial court failed to excuse for cause (1) juror Divine Crabtree, (2) prospective juror Sharon Hughett, (3) prospective juror Loretta Terry, (4) prospective juror Judith Autry, (5) prospective juror Jimmy Chambers, (5) prospective juror Tina Sexton, (6) prospective juror Peggy Frogge, (7) prospective juror Sara Angela Jeffers, (8) juror Pamela Webb, and (9) prospective juror Daniel Murley. In response, the State maintains that the Appellant has failed to establish that the trial court erred in conducting the voir dire.

A criminal defendant is guaranteed the right to a trial by an impartial jury. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To that end, parties in civil and criminal cases are granted "an absolute right to examine prospective jurors" in an effort to determine that they are competent. State v. Kiser, 284 S.W.3d 227, 279-80 (Tenn. 2009) (citing T.C.A. § 22-3-101). The "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985)). The juror's biases need not be proven with unmistakable clarity.

Id. However, the trial court must have a "definite impression" that the prospective juror cannot follow the law. Id. (citing State v. Hutchinson, 898 S.W.2d 161, 167 (Tenn. 1994)).

Here, all of the prospective jurors challenged by the Appellant in the instant appeal maintained they could be fair and impartial. Only two of the challenged jurors sat on the final jury and both maintained they could be fair and impartial and could consider only that evidence introduced during the trial. Regardless of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. Howell, 868 S.W.2d at 248; State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause "is grounds for reversal only if the defendant exhausts all [of his] peremptory challenges, and an incompetent juror is forced upon him." Ross v. Oklahoma, 487 U.S. 81, 89, 108 S. Ct. 2273, 2279 (1988); State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990). Here, the record does not support a conclusion that the jurors impaneled were incompetent. Moreover, the record before this court fails to reveal the allocation of the peremptory challenges. Each side had fifteen peremptory challenges, and only twenty-two peremptory challenges were exercised at the time the final jury was empaneled. Accordingly, the Appellant is not entitled to relief on this issue.

## V.
### A. Admission of Allegations of Child Abuse.

The Appellant challenges the trial court's admission of testimony regarding allegations of child abuse. Prior to the trial, the State sought to introduce evidence of specific allegations of sexual abuse, arguing that such evidence established a motive for the murders of Stanley and Terry Sue Goodman. The State argued that the evidence was not used to prove prior bad acts of personal violence but rather to prove strong motive. The evidence of sexual abuse was to be admitted through the testimony of Hope Tharp, an investigator with the Department of Children's Services (DCS). After hearing argument on the issue at a pre-trial hearing, the trial court made the following findings of fact and conclusions of law:

> . . . Based on everything . . . that this is not about a child sex case, that lends me to caution the State about evidence – graphic evidence concerning those allegations. I just don't think they're necessary.
>
> I think everything that I have heard this morning tells me that you're seeking primarily to introduce [the effect of] these allegations . . . on the Defendant. And that's what I want to stay with. You should caution your witnesses that . . . I really don't think it's necessary that they say anything

graphically – in a graphic manner . . . as to what the accusations are. . . . That simply is not necessary and I think that we border on undue prejudice when we get into that area.

. . . .

So – but I think <u>Moss</u> is on point. . . . Mr. Sexton is facing the greatest possible punishment that we have.  And I'm going to make sure that any prejudicial effect is limited to just what it has to be and not more. . . .

I think – the General . . . says that we'll not be dwelling on the actual – the statements made by an agent or the Department of Human Services, the DCS agent.  I will let the jury hear it once.  I'm going to give them a limiting instruction as to how they're to take it and then I don't want to hear anymore.  I don't ever want anybody to go back to what that allegation was [sic].  And if I do, then their testimony is subject to be stricken from the record entirely. . . .

. . . .

. . . I find that the evidence the State seeks to admit is material, I find that the probative value outweighs the substantial – any substantial prejudice that might exist.  And I'm going to allow the State to introduce evidence with the understanding that it's simply to set the stage as to why the Defendant – explain the Defendant's reactions upon hearing these allegations.  I'm going to give a limiting instruction as soon as the testimony is over.  And I will also give a limiting instruction within the final instructions as to how the Jury is to take the evidence.

. . . .

The initial witness[, Ms. Tharp,] will get to say . . . what she told him and his response thereof.  And then any further statements made by the Defendant would be prefaced on "well, I talked to him about this."  But not specifics. . . .

. . . .

[Ms. Tharp] will be able to testify as to what she told him.  She will be able to say, I said – I asked him about this.  And I essentially want a quote, if

she can do it. I mean she can say, I told him A, B, C, and he said D, E, F. I mean . . . rather than going into summaries, I think the best way to handle this, if we're going by what the State is trying to get it in and for the purpose then they need to be very clear about what this witness said to him exactly and what his particular response was. And that's where I'm limiting. I don't want any summary. I don't want anything going outside of [these limitations].

. . . Ms. Tharp will testify when it comes – when it certainly comes down to the more graphic type allegations, she needs to testify to exactly what she said to him. And then she may say exactly what he said to her. And then she may go farther and explain the area around that. But then that . . . would be it, as to any graphic testimony. . . .

During the trial, Ms. Tharp testified that she told the Appellant that the alleged victim said that the Appellant told her, "[C]lose your eyes and open your mouth," that she obeyed, and that when she opened her eyes, "she saw the bad spot." She further testified that she told the Appellant that the alleged victim said that "she was made to put her mouth onto his penis and suck it . . . [and that [he] made [her] put her hand on [his] penis and move it up and down . . . ."

The Appellant submits that the graphic evidence of alleged sexual abuse and the prejudicial hearsay should have been excluded from evidence in this case. He asserts that this evidence was inadmissible under Rule 404(b), Tennessee Rules of Evidence, and its admission denied him his right to a fair trial. The State argues that the trial court properly admitted the testimony because it established a motive for the murder of the victims in this case. We agree with the State.

At the time of the Appellant's trial in 2001, Tennessee Rule of Evidence 404(b) (2000), which set out the circumstances under which proof of other acts was admissible in a criminal prosecution, provided:

Other Crimes, Wrongs, or Acts. – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1)     The court upon request must hold a hearing outside the jury's presence;
(2)     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the

record the material issue, the ruling, and the reasons for admitting the
evidence; and

(3)     The court must exclude the evidence if its probative value is
outweighed by the danger of unfair prejudice.

The Rule was drafted in accord with the Tennessee Supreme Court's pronouncements
in State v. Parton, 694 S.W.2d 299 (Tenn. 1985). See Advisory Comm'n Comments, Tenn.
R. Evid. 404. Under Parton, the trial court must also find "clear and convincing" evidence
that the other crime, wrong, or act occurred. Id. In 2003, Rule 404(b) was amended by
moving (b)(3) to (b)(4) and including the "clear and convincing" standard to (b)(3). Rogers,
188 S.W.3d at 612.

Generally, this rule is one of exclusion, and evidence is not admissible that an accused
has committed some other crime or bad act independent of that for which he is charged, even
though it may be a crime or act of the same character as that for which the accused is on trial.
See Howell, 868 S.W.2d at 254. If, however, evidence that a defendant has committed a
crime or bad act separate from the one for which he is being tried is relevant to some matter
actually in issue in the case on trial and its probative value is not outweighed by the danger
of its prejudicial effect, the evidence may be admitted. See id. "Only in an exceptional case
will another crime, wrong, or bad act be relevant to an issue other than the accused's
character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of
mistake or accident." State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995). We
review a trial court's ruling on evidentiary matters under Rule 404(b) under an abuse of
discretion standard, provided the trial court has substantially complied with the prerequisites
of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The Appellant contends that the trial court failed to "substantially comply" with the
procedures of Rule 404(b). The trial court held a 404(b) hearing outside of the jury's
presence. The trial court determined that a material issue existed other than conduct
conforming to a character trait and stated the material issue, the Appellant's motive, its
ruling, and its reasoning for the ruling on the record. The trial court further found that the
probative value of the information outweighed the prejudicial impact. However, the trial
court failed to determine whether there was clear and convincing evidence that the prior bad
act occurred. As noted by the Appellant, the trial court recognized its error in the order
denying the motion for new trial:

This court did inadvertently fail to specify on the record that the evidence
presented . . . established by clear and convincing evidence the conduct
referred to in the motion to exclude. However, despite the absence of the
appropriate language at the motion hearing, this court found and still finds that

the state's burden of proof was met by clear and convincing evidence. The evidence was probative and relevant to a material fact in this case, specifically motive and intent. That probative value sufficiently met the standards of admissibility under Rule 404(b) as previously ruled upon by this court.

Regardless of the trial court's subsequent statement of his findings, the trial court had an obligation at the time of the hearing to state on the record whether the prior act was proven by clear and convincing evidence. Additionally, the trial court failed to receive the proposed testimony of Ms. Tharp in its 404(b) hearing. Given the trial court's failure to make a clear and convincing evidentiary determination based on the facts in this case, we conclude that the trial court did not substantially comply with the procedural requirements of Rule 404(b). Compare State v. Albert Eugene Pleasant, No. M1998-00653-CCA-R3-CD, 2001 WL 741932, at *7-8 (Tenn. Crim. App., at Nashville, July 3, 2001) (stating that the trial court did not substantially comply with Rule 404(b) requirements when it did not make a clear and convincing evidence determination or weigh the probative value of the evidence against the unfair prejudicial effect), with State v. Ray Anthony Nelson, No. 03 C0 1-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App., at Knoxville, Sept. 9, 1998) (stating that the trial court substantially complied with Rule 404(b) when it met all the requirements of the rule except for the need to make a clear and convincing evidence determination and the record showed that there was "no real question" that the alleged act occurred) and DuBose, 953 S.W.2d at 652 (stating that the trial court did not substantially comply with Rule 404(b) when the trial court failed to state the prior acts' relevance to a material issue on the record and failed to determine that the probative value of the evidence outweighed the unfair prejudicial effect). Therefore, we review this issue without deference to the trial court's finding and conclusion.

We acknowledge that no direct testimony was introduced at the 404(b) hearing. However, Hope Tharp testified at the preliminary hearing in this case. The State submitted a transcript from the preliminary hearing to the trial court for its consideration in ruling on the 404(b) motion. Hope Tharp's preliminary hearing testimony was substantially similar to the State's proffer of her testimony to the trial court. Accordingly, we conclude that clear and convincing evidence was presented to establish that the prior bad act occurred.

In State v. Moss, the appellant argued that the trial court erred in permitting the State to introduce evidence of prior acts of misconduct between the defendant and his minor daughter. 13 S.W.3d 374, 382 (Tenn. Crim. App. 1999). The State asserted that the evidence was relevant to establish a motive for the murder. Id. The trial court admitted the testimony of the minor daughter, and this court affirmed the trial court's decision. Id. at 383-84. Specifically, this court held that the trial court complied with the procedural requirements of Rule 404(b), Tennessee Rules of Evidence, and that the record supported the

trial court's determination that the evidence was material to a matter in issue at trial, that being the defendant's motive and intent to shoot the victim. Id. The State's theory in Moss was that the defendant shot his wife in order to collect insurance proceeds and to regain access to his minor daughter. Id. Specifically, this court held:

> The prior bad acts evidence supplies a motive and an intent for the murder. It was offered to explain the defendant's focus on MM, her reluctance to return to Tennessee, and an ongoing conflict between the defendant and the victim. The evidence was unrefuted and the defendant admitted that his daughter had testified truthfully. In our view, the trial court properly ruled that the evidence had strong probative value. While there is obviously a risk of unfair prejudice, particularly when allegations of sexual misconduct are involved, the trial court had provided the jury with limiting instructions immediately following the testimony at issue and did so a second time in the general charge. It is our conclusion that the probative value of this evidence was not outweighed by a danger of unfair prejudice and that the trial court did not abuse its discretion by admitting this evidence.

Id. at 384.

We conclude that the testimony of Ms. Tharp delineating the prior bad acts by the Appellant was relevant to establishing a motive for the murders of Stanley and Terry Sue Goodman. Considering, however, the numerous admonitions of the trial court to abstain from graphic testimony regarding the nature of the alleged act, the trial court clearly intended to specifically limit Ms. Tharp's testimony regarding the details of the alleged incident. While this information was indeed prejudicial, we cannot conclude that the danger of unfair prejudice outweighed the probative value of this testimony. Moreover, the trial court provided a curative instruction to the jury stating that the jury was only to consider Ms. Tharp's testimony for the limited purpose of determining whether it provided a motive. The Appellant is not entitled to relief on this issue.

### B. Alleged Violation Crawford v. Washington.

The Appellant also argues that pursuant to Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), the statements made by B.G. and introduced through the testimony of Ms. Tharp violated his right to a face-to-face confrontation of B.G. He asserts that since he did not have the opportunity to cross-examine B.G., he is entitled to a new trial.

Generally, the admissibility of evidence rests within the trial court's sound discretion. Absent a clear abuse of that discretion, the appellate court will not interfere with the trial

court's ruling. State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or makes a ruling that is "'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W. 3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). However, "[w]hether the admission of hearsay statements violated a defendant's confrontation rights is, however, a pure question of law." Franklin, 308 S.W.3d at 809 (citing Lilly v. Virginia, 527 U.S. 116, 125, 119 S. Ct. 1887, 1894 (1999); Lewis, 235 S.W.3d at 141-42). "The proper application of that law to the trial court's factual findings is likewise a question of law, subject to de novo review." Franklin, 308 S.W.3d at 809.

As previously discussed, the State presented the testimony of Hope Tharp, a team leader for the Department of Children Services. Ms. Tharp testified that, on March 17, 2000, she received a request by the Scott County Department of Children's Services to interview B.G. This investigation was ongoing for two months. Then, on May 16, 2000, the Bradley County Department of Children's Services received a request to respond to Black Fox Elementary School to speak with B.G. regarding her reports of alleged sexual abuse. Based upon information received by a case manager who had responded to the school, Ms. Tharp felt it necessary to request permission for the removal of B.G. Ms. Tharp's testimony revealed that she had a conversation with the Appellant, in which she informed him that B.G. and two other children in the home were already in the custody of the Department of Children's Services and that the reason for this was based on information provided by B.G. She explained that B.G. had "stat[ed] that [the Appellant] had sexually abused her and on that basis we had to file a petition for custody since the mother [did] not believ[e] her."

Ms. Tharp was then asked about the conversation she had with the Appellant and his wife regarding the allegations of sexual abuse. Ms. Tharp stated that the Appellant's statements and the statements of the three children "were identical" with the exception that the Appellant omitted "the explicit sexual details that [B.G.] gave me." Ms. Tharp continued:

THARP:  . . . I had B.G. demonstrate for me what had happened. So, I explained to him, you know, B.G. demonstrated to me that you called her down the stairs; she came down the stairs; you said something, she couldn't hear what you said, so she walked over to the couch; and that you were sitting on the couch smoking a cigarette, watching TV, had on a gray shirt and blue jogging pants. And B.G. told me that he grabbed her by the arms and sat her on the couch.

THARP:  . . . I told Mr. Sexton that B.G. had told me that he had grabbed her by the shoulders and sat her down. And I told him, I said, you know, as I talked to her, she told me some things that didn't make a lot of sense to me. So, I had to have her show me what she was talking about. . . .

So, I told him, I said, I had B.G. show me exactly on the couch how she was sitting. Because I told him, B.G. told me her feet were on the floor, but she was laying on the couch. And I didn't understand how that could occur, which made me think, well, maybe something is not right. So, I told him, I said, I had B.G. showed [sic] me, and B.G. showed me that she was sitting facing him, which would have been in this direction, her feet on the floor, and she was leaning down this way onto the couch. I told him I asked her why she was, and she – and if he had said anything to her. And I told him, B.G. told me you said, "Close your eyes and open your mouth." And B.G. – I told him, I said, B.G. said that she closed her eyes and she opened her mouth. And when she opened her eyes she saw the bad spot.

And I told him I didn't know what she meant by that, so I asked her to describe that for me. And I told him, she described that for me as the place that he pees and it has a hole in it. And I told him I said, B.G., if you're telling me that you can see his place that he pees but he has on clothes, I don't understand how you can do that. And I told him, B.G. explained to me that you pulled your penis out of your jogging pants and she saw it when she opened her eyes.

And I told him, I said, I asked B.G., well, what happened after that. And I explained to him that B.G. told me that she was made to put her mouth onto his penis and suck it. And I told him that B.G. – I told him, I said I asked her if anything else happened. And B.G. told me that you made her put your hand on your penis and move it up and down like this.

And I told him I asked B.G., can you tell me anything else about this that would help me understand what happened. And I told

-25-

him that B.G. told me that it tasted yucky. And I told him, I asked B.G. if anything had come out and I told him that B.G. told me no, nothing had come out, but that she could taste it.

I also told him that B.G. told me that he had pushed her off the couch and that B.G. told me he told her if she ever told, she would never see her dad again.

Ms. Tharp then related that the Appellant denied these allegations and stated that B.G. was "getting this information from . . . her sister . . . and her father." The Appellant advised Ms. Tharp that in February 2000 he had received a telephone call from Stanley Goodman during which Stanley Goodman played a tape on which "Mr. Goodman [was] telling B.G. to say these things and B.G. was saying these things."

Subsequent to Ms. Tharp's testimony, the trial court issued the following instruction to the jury:

Ladies and gentlemen, during this trial there may be times that I give you what we call a jury instruction. During the trial, it would be called a curative instruction. What that means is, I am going to give you a legal definition or an instruction concerning some evidence that you may or may not have heard. This is, at this time, a curative instruction concerning some of the evidence that Ms. Tharp gave you today. Please listen carefully. This will also be included at the final stage. . . .

You have heard evidence that the Defendant was accused of sexual abuse of a child. The Defendant is not on trial for any offenses associated with child sexual abuse. You may not consider this evidence to prove the Defendant's disposition to commit the act of premeditated murder. This evidence can be considered by you only for the limited purpose of determining whether it provides motive. In other words, you may consider the accusation only as it tends to show a motive of the Defendant to commit the crime charged in this case. Such evidence of the accusation, if considered by you for any purpose, must not be considered for any purpose other than motive.

The Appellant's trial was held in June 2001. At the time of the Appellant's trial, Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539 (1980), provided the applicable standard regarding the introduction of testimony and the Confrontation Clause. After the Appellant's trial but before the hearing on the motion for new trial, the United States Supreme Court overruled Roberts by issuing its opinion in Crawford v. Washington, 541 U.S. 36, 124 S. Ct.

-26-

1354 (2004). The new rule of law announced by Crawford, although not in existence at the time of the Appellant's trial, is applicable to the Appellant's case while the matter is still on direct appeal. See generally Whorton v. Bockting, 549 U.S. 406, 127 S. Ct. 1173 (2007).

In Crawford, the Supreme Court held that the Confrontation Clause of the Sixth Amendment to the United States Constitution prohibits admission in a criminal trial of testimonial statements by a person who is absent from trial, unless the person is unavailable and the defendant had a prior opportunity to cross-examine the person. However, out-of-court statements made by someone other than the declarant while testifying are admissible if the statement is not hearsay. Indeed, in Crawford, the Supreme Court explicitly stated that the Confrontation Clause does not bar the admission of testimonial statements that are admitted for purposes other than proving the truth of the matter asserted. Crawford, 541 U.S. at 59, n.9, 124 S. Ct. at 1369, n.9. Thus, in order for Crawford to apply in the instant case, B.G.'s statements to Hope Tharp must, in fact, constitute testimonial hearsay.

Hearsay is an out-of-court statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). When an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay and is admissible. Hearsay is present only if the out-of-court statement must be true to be relevant. Neil P. Cohen, et al., Tennessee Law of Evidence § 8.01[4][i], at 8-16 (5th. ed. 2005). Thus, to constitute hearsay, it is important whether the declarant is telling the truth. If the declarant's credibility is irrelevant because it does not matter whether the declarant is telling the truth, the dangers of hearsay are not present and the statement is not viewed as hearsay. Id.

The trial court determined that the statements of B.G. to Hope Tharp were not hearsay as they were admitted to establish the Appellant's motive for the murder of B.G.'s father and his wife. We agree. Here, the record shows the State's theory at trial was that the Appellant murdered the victims in retaliation for his belief that the victim had induced the minor B.G. to make false allegations of sexual abuse against the Appellant. While B.G.'s statements to Hope Tharp may have been testimonial in nature, the statements were not admitted to prove that the Appellant actually perpetrated the sexual acts against B.G. Rather, the statements were admitted to establish the Appellant's motive for the murders of B.G.'s father and stepmother. This court has repeatedly upheld the admission of similar statements as non-hearsay because they were offered to prove the defendant's motive. See State v. Williams, 977 S.W.2d 101, 108 (Tenn. 1998) (upholding declarant's statements recounting non-testifying witness's version of assault as non-hearsay because it demonstrated defendant's motive for killing the victim); State v. Coker, 746 S.W.2d 167, 173 (Tenn. 1987) (citing State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980)). The impact of B.G.'s

statements upon the Appellant, not their veracity, was relevant as the motive for the murders in this case. Indeed, the truth of B.G.'s statements was immaterial. Because the statements were not admitted for the truth of the matter asserted, the statements were not hearsay and cross-examination was not required to test their veracity.

As previously determined, we reiterate that the probative value of the statements was not outweighed by the danger of unfair prejudice. Indeed, the falsity of the accusation in this case increased its probative value. When a statement is admitted for a legitimate, non-hearsay purpose, that is, not to prove the truth of the matter asserted, the statement is not hearsay under the traditional rules of evidence and the non-hearsay aspect raises no confrontation clause concerns. See Tennessee v. Street, 471 U.S. 409, 417, 105 S. Ct. 2078, 2083 (1985) (holding that Street's confrontation clause rights were not violated by the introduction into evidence of accomplice's confession for nonhearsay purpose of rebutting Street's testimony that confession was coercively derived from accomplice's statement); see also Crawford, 541 U.S. at 59, 124 S. Ct. at 1369 (citing Tennessee v. Street for proposition that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted). Accordingly, the Appellant's argument that the admission of B.G.'s statements through the testimony of Hope Tharp violated his rights under the Confrontation Clause fails.

## VI. Admission of Testimony Regarding the Appellant's Willingness and Later Refusal to Take a Polygraph Examination.

The Appellant contends that Deputy Millsaps and Detective Alvarez were improperly permitted to testify that the Appellant stated that he would take a polygraph examination and then decided not to take the test. On direct examination, Deputy Millsaps testified that he had a discussion with the Appellant about taking a polygraph test while he was at the Appellant's apartment. The Appellant agreed to take the polygraph test. On cross-examination, defense counsel again brought up the fact that the Appellant agreed to take the polygraph test. On re-direct, the State asked Deputy Millsaps whether he was aware that the Appellant later refused to take a polygraph test. An objection was made by defense counsel, which was overruled by the court. Detective Alvarez testified that he had discussions with the Appellant regarding some polygraph examinations. He stated that the test was offered, but the Appellant refused to take the test. No objection was made to Detective Alvarez's testimony.

"[P]olygraph examination results, testimony on such results, or testimony regarding a Defendant's willingness or refusal to submit to a polygraph examination is not admissible during capital or non-capital sentencing hearings." State v. Stephenson, 195 S.W.3d 574, 599 (Tenn. 2006); State v. Pierce, 138 S.W.3d 820, 826 (Tenn. 2004). In this case, the

-28-

testimony was elicited by the prosecution. Regarding the admissibility of incompetent evidence, "the correct practice is to reject such evidence at once, and not permit it to go to the jury." Stokes v. State, 64 Tenn. 619, 621 (1875). Any potential error, however, resulting from unsolicited testimony that offers otherwise inadmissible testimony may be cured by a proper instruction to the jury to disregard the comment. See State v. West, 767 S.W.2d 387, 397 (Tenn. 1989); State v. Foster, 755 S.W.2d 846, 849 (Tenn. Crim. App. 1988).

In its order denying the Appellant's motion for new trial, the trial court conceded that admission of testimony regarding the polygraph testing was inadmissible. Notwithstanding, the trial court noted the defense's failure to make a contemporaneous objection to the direct testimony of Deputy Millsaps. In fact, no objection was made to the testimony until defense had already cross-examined Deputy Millsaps as to the polygraph examination and the State was asking additional questions on re-direct. The trial court determined that because the testimony was either neutral or favorable to the defense, any error in admitting this testimony was harmless.

We agree with the trial court's ruling pertaining to the testimony of Deputy Millsaps and Detective Alvarez regarding a polygraph examination. Reversible error may not be predicated upon a ruling admitting evidence unless a substantial right of a party was affected and unless a timely objection was made. Tenn. R. Evid 103 (a). No objection was made by the Appellant to this testimony until after defense counsel had already questioned Deputy Millsaps on cross-examination as to the polygraph examination. A party may not later seek relief from an error to which he acquiesced or failed to take a reasonable action to nullify the harmful effect of the error. Tenn. R. App. P. 36(a). We further note that the testimony revealed that the Appellant's ultimate decision not to take the polygraph test was based upon information from a TBI test examiner that the test could be fixed. Moreover, we cannot conclude that the admission of this testimony regarding a polygraph test more probably than not affected the judgment or resulted in prejudice to the judicial process. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## VII. Admission of Statements Made by the Appellant's Wife.

During the trial, the State presented testimony which indicated to the jury that the Appellant's wife, Sherry Sexton, implicated him in the murder for which he was on trial. The Appellant contends that this testimony violated his right to confront witnesses. He contends that "the jury only heard the prejudicial account from the prosecution and law enforcement authorities about the circumstances of the prior statements and testimony of the Appellant's wife, and did not know whether the [Appellant's] wife would have willingly appeared and testified; and if she appeared, to what she would have testified." He further

argues he was denied the opportunity to challenge through cross-examination his wife's motivation or the truthfulness of her testimony.

The Appellant fails to provide citation to the record directing this court to the testimony to which he now objects. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Issues not supported with appropriate references to the record shall be treated as waived. Additionally, upon review of the appellate record, it appears that the Appellant failed to make contemporaneous objections to the testimony and argument of which he now complains. He cannot now seek relief from an error to which he acquiesced or failed to take a reasonable action to nullify the harmful effect of the error.

In any event, we have reviewed the testimony at issue. The officers testified that they received a message that Sherry Sexton was attempting to contact them. Detective Alvarez contacted Sherry Sexton. He reported that she sounded desperate. He further related that she agreed to meet him at the police station. Detective Alvarez contacted Special Agent Brakebill and advised him of the meeting. The officers met Sherry Sexton at the south precinct. The officers stated that within thirty minutes of their discussion with Sherry Sexton, the Appellant arrived, upset and agitated, and he wanted to speak with his wife. The Appellant informed the officers that Sherry Sexton was upset and confused. Detective Alvarez escorted the Appellant to the side of the building while Agent Brakebill moved Sherry Sexton to a safe harbor home for the night.

Initially, we conclude that no rights of confrontation were infringed. The Appellant had the opportunity to cross-examine the officers as to the extent of their testimony. No statement made by Sherry Sexton was introduced through the testimony of the officers. Rather, the officers related their first hand observations of what occurred on May 24, 2000. The statements were not hearsay. The Appellant's contention that officers' testimony encompassed the testimony of Sherry Sexton is misplaced. The testimony of the officers was relevant to show that the Appellant believed that his wife could incriminate him. The Appellant is not entitled to relief on this issue.

## VIII. Admission of Rifle Similar to the Murder Weapon.

At trial, the State introduced as an exhibit an inoperable rifle retrieved from the Appellant's home. This rifle was not the murder weapon. The Appellant did not render a contemporaneous objection to the introduction of the rifle during the trial. In its order denying the motion for new trial, the trial court found:

> The evidence at trial established that the weapon referred to in the defendant's
> home did not work and that this was the reason that he had acquired another

gun from witness Clinton Daniel Mason. Under these circumstances, this court finds no error in the admission of the weapon.

The "determination of whether evidence is relevant is within the sound discretion of the trial court." State v. Dellinger, 79 S.W.3d 458, 485 (Tenn. 2002) (citing State v. Griffis, 964 S.W.2d 577, 594 (Tenn. Crim. App. 1997)). While there is a natural tendency to connect the weapon introduced into evidence at trial and the weapon actually used to commit the murder, there is no such connection in the present case. The testimony was clear that this rifle was not the murder weapon. The testimony was clear that this rifle was inoperable. The trial court concluded that the inference was made that, since this rifle was inoperable, the Appellant needed to obtain another weapon from Clinton Daniel Mason. There was no attempt to suggest that this rifle was the murder weapon. Thus, little possibility existed that the jurors, without proof, would prejudicially associate this rifle as the murder weapon used by the Appellant. The Appellant is not entitled to relief on this issue.

## IX. **Admission of Evidence of an Unrelated Speeding Arrest.**

The Appellant next complains that the trial court erred by allowing the admission of evidence of an unrelated speeding arrest that was not a conviction. During the trial, defense counsel presented Randall Boston, an employee of defense counsel. The purpose of Mr. Boston's testimony was to establish the time it took to drive from the Muffler Shop in Cleveland, Bradley County, to Huntsville, in Scott County. Mr. Boston's testimony reflected that, although he drove the shortest route, he observed all posted speed limits. On cross-examination, Mr. Boston conceded that he was unaware that the Appellant had received a speeding ticket for driving 97 miles per hour on the same route two days after the murder. Mr. Boston was questioned about the speeding ticket without objection.

In its order denying the motion for new trial, the trial court found:

The defense presented proof of the distance and the amount of time that it would take to get from Cleveland to Huntsville through an employee of defense counsel, Randall Boston, who admittedly had driven in a very prudent manner and had observed all speed limits. On cross-examination, the state asked the witness, without objection, about the speeding ticket received by the defendant. Under these circumstances, this court finds that this issue does not support a new trial.

The Appellant failed to make a contemporaneous objection. A party is not entitled to relief when the party fails to take whatever action was reasonably available to prevent or nullify the harmful effect of the error. Tenn. R. App. P. 36(a). Waiver notwithstanding, in

our view, the testimony proved only that people can drive above the speed limit. The Appellant is not entitled to relief.

## X.  Admission of Evidence Obtained from Appellant's Vehicle.

The Appellant contends that it was error to admit evidence retrieved during an illegal search of his automobile taken in violation of his Fourth Amendment rights. The Appellant argues that his due process rights were violated when the State failed to correct Agent Brakebill's testimony that he saw a typed statement for the Appellant which contained the express consent to search his automobile.

The Appellant fails to provide citation to the record directing this court to the testimony to which he now objects. Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b). Issues not supported with appropriate references to the record shall be treated as waived. Additionally, upon review of the appellate record, it appears that the Appellant failed to make contemporaneous objections to the testimony and argument of which he now complains. He cannot now seek relief from an error to which he acquiesced or failed to take a reasonable action to nullify the harmful effect of the error. In any event, our review of the record shows that the Appellant consented to the search of the automobile. He is not entitled to relief.

## XI. Admission of Evidence relating to the Preparation of Appellant's IRS Tax Forms.

During the guilt phase of the Appellant's trial, the State called Shera Crowley as a witness. Ms. Crowley testified that she operated a tax service and had prepared the Appellant's tax return for two or three years. When Ms. Crowley prepared the Appellant's taxes on January 31, 2000, she stated that the Appellant had removed his daughter B.G. and added E.G. as a dependant. Ms. Crowley noted this action was unusual and asked the Appellant if Stanley Goodman, E.G.'s father, was claiming her as a dependant. She stated that the Appellant initially responded that Goodman was not claiming E.G. When Ms. Crowley told the Appellant that she believed E.G. lived with Stanley Goodman, the Appellant responded, "[I]f the son of a bitch ever tried to claim her or take her, he would blow his G.D. brains out." No objection was made to this testimony by defense counsel.

On cross-examination, Ms. Crowley testified that "someone . . . claiming their stepchild and they're claiming they don't live with the mother, that is a red flag for me." She stated she was required to ask questions, but she was not required to conduct an investigation. Ms. Crowley testified that she took the Appellant's threat seriously enough

to convey the threat to Terry Sue Goodman. Ms. Crowley related that Terry Sue Goodman was not concerned about the threat since the Appellant had made similar threats in the past. Ms. Crowley also stated that the Appellant would probably receive an additional $1200 as a tax refund for claiming E.G. as a dependant on his taxes.

The Appellant complains that it was error for the trial court to admit evidence and argument regarding the Appellant's alleged intent to defraud the Internal Revenue Service in the preparation of his tax returns. He adds that this argument was compounded by the closing arguments of the prosecutor. Again, there was no contemporaneous objection made at trial. Furthermore, the defense extensively cross-examined Ms. Crowley on the issue. A party is not entitled to relief when the party fails to take whatever action was reasonably available to prevent or nullify the harmful effect of the error. Tenn. R. App. P. 36(a). The Appellant is not entitled to relief on this issue.

## XII. Whether Individual and Cumulative Instances of Prosecutorial Misconduct Denied Appellant a Fair Trial.

The Appellant argues that instances of prosecutorial misconduct individually and cumulatively prevented him from receiving a fair trial. These incidents of alleged misconduct include (1) the prosecutor's remarks during opening statements that B.G. told her teacher and the Department of Children Services worker that the Appellant was sexually molesting her; (2) the prosecution's questioning of Deputy Millsaps regarding the Appellant's willingness to take a polygraph regarding the allegations of child sexual abuse and then his refusal to take the test when given the opportunity; (3) the prosecution's questioning of TBI Agent Brakebill regarding his interview with Sherry Sexton which implied that she had implicated her husband in the murder allegations; (4) the prosecution's statements made during closing argument at the guilt phase including repeated statements that the Appellant had sexually molested his stepdaughter, the repeated out-of- court statements of Sherry Sexton, improperly vouching for prosecution witnesses, and the suggestion that the Appellant would have killed E.G. had she come home at the wrong time; and (5) the prosecution's statements during closing argument at the penalty phase.

Regarding whether prosecutorial misconduct based on improper comments amounts to reversible error, a reviewing court must determine whether the alleged conduct was so improper or the comments so inflammatory as to affect the verdict. See State v. Reid, 164 S.W.3d 286, 344 (Tenn. 2005); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). In making its determination, the court must consider five factors:

1)   The conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
2)   The curative measures undertaken by the court and the prosecution[;]
3)   The intent of the prosecutor in making the improper statements[;]
4)   The cumulative effect of the improper conduct and any other errors in the record[; and]
5)   The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The allegations of misconduct raised by the Appellant relating to the admission of evidence, the Appellant's issues V through XI, have been previously addressed in the above sections of this opinion. Accordingly, our review will focus upon those allegations of misconduct alleged to have occurred during the guilt and penalty phase of closing argument. Five areas of prosecutorial misconduct related to argument are recognized: (1) it is unprofessional conduct for the prosecution to intentionally misstate the evidence or mislead the jury as to the inferences it may draw; (2) it is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of guilt of the defendant; (3) the prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury; (4) the prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict; and (5) it is unprofessional conduct for a prosecutor to intentionally refer to or argue facts. See State v. Goltz, 111 S.W.3d 6 (Tenn. Crim. App. 2003).

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Tennessee Rule of Criminal Procedure 29.1(b) allows a closing argument to address any evidence introduced at trial. In addition to addressing the evidence, parties may also argue "reasonable inferences." State v. Chico McCracken, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), perm. to appeal denied (Tenn. Sept. 2, 2003). When there is improper argument, the court must determine whether the inflammatory statement negatively impacted the defendant.

## A. **Alleged Improper Opening Statement and Closing Argument During Guilt Phase**.

The Appellant complains that the prosecutor repeatedly and improperly made statements that B.G. told the Department of Children Services that the Appellant was molesting her. Specifically, the prosecutor made the following statement during closing argument:

> Five days before the crime. On that day, something happened in the Sexton home that caused [B.G.], the . . . stepdaughter of Hubert Glen Sexton, the daughter of Stanley Goodman . . . to tell her . . . teacher . . . that Hubert Glen Sexton molested me. . . . The children were taken into the custody of the Department of Children's Services. . . . Hubert Glen Sexton was then confronted with his world starting to crumble. . . .

We acknowledge that the Appellant failed to object to this argument. Moreover, the proof presented at trial established this fact. Accordingly, we cannot conclude that this argument was improper.

The Appellant next complains that the prosecutor repeatedly referred to the out-of-court statements of Sherry Sexton, his wife. During the opening statement, the prosecutor stated that a wife may not testify against her husband.[4] He further related how Sherry Sexton went to the police station. The statement continued as follows:

> She's given an interview. And she later even testifies against him. But through his manipulation, she's back on his side now. And of course, you can't testify . . . you can't force a wife to testify against her husband.

Again, the Appellant failed to object to this statement during the trial. When a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33, Tenn.R.App.P.36(a); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).

Next, the Appellant complains that the prosecutor improperly vouched for prosecution witnesses Mason and Chambers. During closing argument, the prosecutor commented that witnesses Preston Adams, Danny Mason, and Christy Swallows "are far from perfect."

---

[4] The Appellant asserts that this argument was made during the State's closing. The record reveals that it occurred during the opening statement and not closing argument.

However, he equated their testimony to that of a three-legged stool. In other words, he asked the jury to take the testimony of these three unacquainted witnesses and put them together to form a solid foundation of the Appellant's guilt.

In his rebuttal argument, the Appellant acknowledged that Danny Mason was scared and that the police had threatened to put his mother in prison. He asked the jury to consider the trial court's instruction on disregarding certain testimony and added, "If you feel like these folks are lying to you, you have the right to disregard their testimony." The defense also poked holes in the testimony of Detective Chambers. Specifically, the defense capitalized on the relationship of Detective Chambers and the deceased and focused on his initial finding of only six casings.

Again, this court first acknowledges that no contemporaneous objection was made to the above comments during the prosecution's argument. Waiver notwithstanding, in our view, the above comments do not amount to the prosecutor improperly vouching for the credibility of these witnesses. We cannot conclude that the prosecutor's conduct during closing argument was improper. The Appellant is not entitled to relief.

Finally, the Appellant complains that the prosecution improperly suggested that the Appellant would have killed E.G. had she been home at the wrong time. During closing argument, the prosecutor commented:

> And the fate of the rain almost made three victims here. Had E.G. gone home and not decided to stay at Vella's a while, had she been a fourth person in that house between 8:45 and 11:00, she would have been the third victim. Fortunately, she wanted to stay with her aunt a while and she wasn't there. And the intervening fate of the rain didn't cause her to be a victim.

The State argues that this argument was not improper as the Appellant murdered Terry Goodman to prevent his detection and arrest for the murder of Stanley Goodman. The State argues that it follows that had E.G. been home, she may have suffered the same fate. Again, there was no contemporaneous objection made by the Appellant. While we do not condone this argument made by the prosecution, we cannot conclude that it affected the verdict. The Appellant is not entitled to relief on this claim.

### B. Alleged Improper Closing Argument During Penalty Phase.

The Appellant objects to various statements made by the prosecution during closing argument at the penalty phase. He complains of statements allegedly commenting on the weight of the aggravating and mitigating circumstances:

- You must look at the mitigating factor, as well you should, because sometimes a crime may be bad, but there may be some really compelling mitigating factors that would change that, and you should do that.

- It involved no other felonies. Well, it wasn't in the course of a bank robbery or something like that, but in effect, there were other felonies involved. It is a crime of aggravated burglary for a person to, without your permission, enter your house with the intent to commit an assault. Of course, normally, we think of burglary as people break in somebody's house to steal something but they could commit some other crime. So there [are] other crimes involved. Of course, no need to charge that in this case, as certainly, there was more than ample opportunity to impose the proper punishment with the things he was charged with. But that is another crime.

- He's responsible for these two deaths, he's responsible for any damage to his children, and he is responsible for the fact that you are considering the death penalty.

- I submit to you it is just as likely as children in Scott County or children involved in this case would be offended if he didn't get justice.

- He used these children to get money back from the income tax, and he used these children in the course of the child abuse allegation, and now he gets to use these children as the reason to escape the ultimate punishment.

- She didn't have her mama to support her, so she had her daddy. Mama was under control of the defendant.

- If, however, the aggravating circumstance is out – is not outweighed by the mitigation beyond a reasonable doubt; in other words, if you find that the bad aggravation of this murder – or these murders are not outweighed beyond a reasonable doubt by the mitigation in his favor, then death can be the punishment.

- [M]any many people experience childhoods and go on to lead productive lives, but you know that some of our greatest leaders experience this much childhood deprivation. . . . Some of our greatest leaders. What about Abraham Lincoln? Did Abraham Lincoln suffer from poverty? I believe he experienced a lot more poverty than Glen Sexton did. Did he suffer from disruptive relationships? Well, he lost his mother when he was little, and then he lost his stepmother when he was a little older. . . . Did he suffer from academic underachievement? . . . Glen Sexton was shuttled around from school to school. Abraham Lincoln had no school . . . . Did he suffer from lack of social support?

. . . growing up in frontier America there was a whole lot less social support than there is today. So I believe Lincoln qualifies there. Did he suffer from parental absence? Yes he did. . . . What about a lack of emotional bonds? We know from history that Abraham Lincoln had a remote father. . . . What about the fact that he had an environment lacking in productive employment. . . .

- [Y]ou should not choose to allow him to hide behind these children anymore.

The Appellant submits that these statements, taken as a whole, prevented him from receiving a fair trial. He asserts that these statements permitted the jury to consider as an aggravating factor facts or circumstances other than that statutory circumstance mandated by law, namely that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of defendant or another."

Examination of the transcript of closing argument reveals that the Appellant made no objection to the prosecutor's argument, with the exception of the analogy between the Appellant's situation and that of Abraham Lincoln. It is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived. Stephenson, 195 S.W.3d at 601 (citations omitted). "Moreover, the prosecution is expressly permitted to rebut any mitigating factors relied on by a Defendant." Id.

Waiver notwithstanding, we have reviewed the record and agree with the Appellant. Some of the prosecutor's statements, including statements that the Appellant committed aggravated burglary and income tax fraud, constituted an attempt to improperly sway the jury. However, when viewed in overall context, these statements were not so inflammatory as to require reversal. The evidence presented at the penalty phase clearly established the presence of the statutory aggravating circumstance. Evidence of mitigating circumstances was scant. The sentencing statute generally permits all evidence deemed relevant to the issue of punishment to be admitted in a capital sentencing proceeding. Any improper conduct by the prosecutor was far outweighed by the strength of the evidence supporting the jury's finding that the aggravating circumstance outweighed proof of any mitigating circumstances. Based upon the proof presented at the penalty phase, it is clear that the prosecutor's comments did not affect the jury's sentencing decision.

### XIII. Sufficiency of the Convicting Evidence.

The Appellant argues the evidence was insufficient to support his convictions. In response, the State contends that this issue is waived because the Appellant simply lists the issue without any supporting argument. Although we agree with the State's contention, due

to the severity of the sentences, this court will review whether the proof presented at trial is sufficient to support his two convictions for first degree premeditated murder. See Tenn. R. App. P. 27; Tenn. Ct. Crim. App. R. 10(b) (The failure to provide argument, citation to the record, and citation to authority results in waiver of the issue on appeal.).

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992). Questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder, as implicated in the present case, is defined as an unlawful, premeditated and intentional killing of another. T.C.A. § 39-13-201, -202(a) (Supp. 2000). Tennessee Code Annotated section 39-13-202(d) provides that:

> [P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d) (1997). Whether the evidence was sufficient depends on whether the State was able to establish beyond a reasonable doubt the element of premeditation. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn.

2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

Viewed in the light most favorable to the State, the proof at trial showed that the Appellant had a motive for the killing because he blamed Stanley Goodman for the accusation of child sexual abuse. The Appellant had threatened to kill Stanley Goodman prior to the murder and procured a gun substantially similar to the murder weapon just before the murder. Finally, the Appellant confessed to killing the victims to several witnesses. This was sufficient evidence from which a rational jury could find beyond a reasonable doubt that the Appellant committed the premeditated killing of the victims in this case. We conclude, therefore, that the evidence was sufficient to sustain the Appellant's convictions for two counts of first degree premeditated murder.

## XIV. **Whether the Verdict was Contrary to the Weight of the Evidence.**

The Appellant contends that the verdict was contrary to the weight of the evidence. Again, the Appellant fails to make argument in support of this claim, fails to cite to the appellate record and fails to cite to any authority. Waiver notwithstanding, as in the previous section, we will review the issue on the merits.

Tennessee Rule of Criminal Procedure 33(f) provides, in part, as follows: "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." In interpreting the rule, our supreme court has held as follows:

> Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment.

State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). "The purpose of the thirteenth juror rule is to be a 'safeguard . . . against a miscarriage of justice by the jury.'" State v. Moats, 906

S.W.2d 431, 434 (Tenn. 1995) (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)). In the present case, the trial court found:

> The defendant claims that the verdict was contrary to the weight of the evidence. Again, this court disagrees and finds this issue to be without merit.

Only if the record contains statements by the trial court indicating disagreement or dissatisfaction with the jury's verdict or evidencing the trial court's failure to act as the thirteenth juror may the reviewing court reverse the trial court's judgment. Carter, 896 S.W.2d at 122. Otherwise, our review is limited to the sufficiency of the evidence. State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). We conclude that the trial court properly exercised its role as the thirteenth juror; therefore, our review is limited to the previously determined sufficiency of the evidence.

## XV. The Constitutionality of Tennessee's Death Penalty Scheme.

The Appellant makes multiple arguments challenging the constitutionality of Tennessee's death penalty scheme. First, he asserts that the imposition of the death penalty violated due process of law because the aggravating circumstance was not set forth in the indictment. In this regard, he contends that any fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the 5th Amendment's Due Process Clause and the 6th Amendment's notice and jury trial guarantees. With reliance upon Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000) and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002), the Appellant submits that he was denied due process of law because the indictment returned by the grand jury did not include facts that would qualify him for the death penalty. In other words, he maintains that first degree murder is not a capital offense unless accompanied by aggravating circumstances. In order to elevate the crime to capital murder, he alleges that the indictment must include language of the statutory aggravating circumstance.

The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. Reid, 164 S.W.3d at 312; Leach, 148 S.W.3d at 59; State v. Berry, 141 S.W.3d 549, 562 (Tenn. 2004); State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); Dellinger, 79 S.W.3d at 467. Our supreme court explained, "[t]he focus in Apprendi, Ring, and Blakely was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." Berry, 141 S.W.3d at 560. The Appellant is not entitled to relief on this issue.

Secondly, the Appellant asserts that the death sentence infringes upon his fundamental right to life and is not necessary to promote any compelling state interest. This complaint, that his death sentence must be reversed because it violates his fundamental right to life is contrary to settled precedent as reflected in Cauthern v. State, 145 S.W.3d 571, 629 (Tenn. 2004) (citing Nichols v. State, 90 S.W.3d 576, 604 (Tenn. 2002); Mann, 959 S.W.2d at 536 (Appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, the Appellant is not entitled to relief on this issue.

Thirdly, the Appellant argues that instructing a jury to unanimously agree to a life sentence violates the United States Supreme Court's holdings in Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 (1988) and McKoy v. North Carolina, 494 U.S. 433, 110 S. Ct. 1227 (1990). This argument has been repeatedly rejected. See Kiser, 284 S.W.3d at 292-93; State v. Ivy, 188 S.W.3d 132, 163 (Tenn. 2006) (citing State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); Thompson, 768 S.W.2d at 250; State v. King, 718 S.W.2d 241, 249 (Tenn. 1986), superseded by statute as recognized by State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994)). He is not entitled to relief.

Next, the Appellant argues that "[i]t was error for the trial court to allow a sentence of death to be imposed in violation of international treaties and laws." However, the Appellant has failed to set forth any argument or citation to authority in support of this issue. Accordingly, the Appellant has waived consideration of this issue. See Tenn. R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b). Notwithstanding waiver, arguments that the death penalty is unconstitutional under international laws and treaties have been rejected by our supreme court. See State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004).

Finally, the Appellant makes several miscellaneous arguments challenging Tennessee's death penalty scheme. Because these arguments are either not supported by citation or authority or have been flatly rejected by the Tennessee Supreme Court, we will address them in short order. The Appellant contends that the trial court erred in failing to conclude that the death penalty statutes violate the prohibition against cruel and unusual punishment and violates due process. Specifically, the Appellant argues that the death penalty statute "allows arbitrary and capricious imposition of the death penalty because it fails to properly narrow those eligible for death." The Appellant fails to support this general claim with argument. However, we acknowledge that our supreme court has rejected the argument that the prosecutors' unlimited discretion in this state to decide whether to seek the death penalty in a first degree murder case causes the system as a whole to be arbitrary and capricious. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995). Similarly, our supreme court has rejected the argument that the Tennessee death penalty statutes fail to properly narrow the pool of death eligible defendants to the vagueness and broadness of aggravating factors. See State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

The Appellant also argues that the Tennessee death penalty statute divests the jury of its ultimate responsibility to determine the life and death decision because of the statute's mandatory language. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22. He further contends that the death penalty is imposed in a discriminatory manner based upon location of the offense, race of defendant and victim, gender of defendant and victim, and economic status of defendant and victim. This argument has been rejected. See Hines, 919 S.W.2d at 582; Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 23. He also challenges the death penalty alleging that it unconstitutionally shifts the burden of proof to the defendant. The Appellant fails to explain how the statute's operation shifts the burden of proof to the defendant. Notwithstanding, we acknowledge that arguments complaining of the shifting of the burden of proof have been rejected by the courts of this state. See State v. Austin, 618 S.W.2d 738 (Tenn. 1981); State v. Dicks, 615 S.W.2d 126 (Tenn. 1981).

The Appellant further argues that the death penalty statutes violate due process in that the statutes permit the prosecuting attorney to make the final closing argument. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; State v. Caughron, 855 S.W.2d 526, 542 (Tenn. 1993). He also submits that the death penalty statutes are unconstitutional in that they require that the mitigating factors must outweigh the aggravating circumstances in order to avoid the death penalty. This argument was rejected in State v. Bane, 853 S.W.2d 483, 488-89 (Tenn. 1993).

The Appellant next submits that the appellate review process in death penalty cases is constitutionally inadequate in its application. He contends that the appellate review process is not constitutionally meaningful because the methodology of review is flawed and does not require the jury to make findings of fact as to the presence or absence of mitigating factors. This argument has been specifically rejected by our supreme court on numerous occasions. See Cazes, 875 S.W.2d at 270-71; see also State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992); State v. Barber, 753 S.W.2d 659, 664 (Tenn. 1988). Moreover, the supreme court has recently held that "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997).

Because all of the Appellant's arguments challenging the constitutionality of Tennessee's death penalty have been rejected by the above settled authority, we conclude that he is not entitled to relief.

### XVI. Whether the Trial Court Erred in Denying the Motion for New Trial Based on the Cumulative Effect of the Errors at Trial.

The Appellant argues that the trial court erred in failing to grant his motion for new trial based upon the cumulative effect of the errors at his trial. Initially, we note that although the United States Constitution and the Tennessee Constitution grant the right to a fair trial, they do not grant the right to a perfect trial. State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000 (citing State v. Smith, 755 S.W.2d 757, 765 (Tenn. 1988)). In State v. Hester, the Tennessee Supreme Court recently defined the doctrine of cumulative error:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

— S.W.3d. — , No. E2006-01904-SC-DDT-DD, 2010 WL 3893760, at *61 (Tenn. Oct. 5, 2010) (citing Alvarez v. Boyd, 225 F.3d 820, 824 (7th Cir. 2000); United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990); United States v. Wallace, 848 F.2d 1464, 1475 (9th Cir. 1988); State v. Perry, — P.3d — , No. 34846, 2010 WL 2880156, at *20 (Idaho July 23, 2010); State v. Duffy, 967 P.2d 807, 816 (1998)). The Hester court also found that United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993), provided helpful insight regarding the cumulative error doctrine. Hester, 2010 WL 3893760, at *61. In Sepulveda, the United States Court of Appeals for the First Circuit provided guidance for appellate courts when considering whether the aggregated errors at trial deprived a defendant of a fair trial:

> Of necessity, claims under the cumulative error doctrine are sui generis. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy – or lack of efficacy – of any remedial efforts); and the strength of the [State's] case. See, e.g., [U.S. v.] Mejia-Lozano, 829 F.2d [268,] 274 n.4 [(1st Cir. 1987)]. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

Sepulveda, 15 F.3d at 1196.

Upon review, the errors in the Appellant's trial "do not lend themselves to being aggregated to show that he failed to receive a fair trial in either the guilt or capital sentencing phase." Hester, 2010 WL 3893760, at *61 (internal footnote omitted). Therefore, on this

record, there is no basis to conclude that the aggregated errors deprived the Appellant of a fair trial. We conclude that the trial court properly denied the Appellant's motion for new trial on this basis.

## XVII.  Proportionality Review.

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), we are required to review the application of the death penalty to determine whether:

(A)  The sentence of death was imposed in any arbitrary fashion;

(B)  The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C)  The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D)  The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

T.C.A. § 39-13-206(c)(1).

**A. Arbitrariness.**  Having thoroughly reviewed the record, we conclude that the sentence of death was not imposed in an arbitrary fashion.

**B. Sufficiency of Statutory Aggravating Circumstance Found by the Jury.**  The jury found that the proof established the statutory aggravating circumstance that "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." T.C.A. § 39-13-204(i)(6). The Appellant does not challenge the imposition of this aggravating circumstance. This aggravating circumstance focuses on a defendant's motives in killing the victim. State v. Young, 196 S.W.3d 85, 116 (Tenn. 2006) (citations omitted); Ivy, 188 S.W.3d at 149. Although there must be some "particular proof" supporting this aggravating circumstance, State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim. Young, 196 S.W.3d at 116. However, we have indicated that there must be some "particular proof" in the record to support this aggravating circumstance, Hartman, 42 S.W.3d at 58, and mere plausibility of the theory that avoiding arrest or prosecution was one of the motives of the murder is insufficient. State v. Powers, 101 S.W.3d 383, 399 (Tenn. 2003).

The proof established that the Appellant made comments that he was not going to prison for child sexual abuse but might go to prison for murder. The proof also established that the Appellant blamed Stanley Goodman for the allegations of child sexual abuse made by his stepdaughter. Accordingly, there was sufficient proof to support the aggravating circumstance found by the jury.

**C. Totality of Aggravating Factors Applied.** With consideration of the evidence before the jury, we conclude that the evidence supports the jury's finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

**D. Proportionality.** This court is required by Tennessee Code Annotated section 39-13-206(c)(1)(D) and the mandates of Bland, 958 S.W.2d at 661-74, to consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases. State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review "is designed to identify aberrant, arbitrary, or capricious sentencing." State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001). It does this by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 43, 104 S. Ct. 871, 876 (1984)). If a case is "'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." Stout, 46 S.W.3d at 706 (quoting Bland, 958 S.W.2d at 668).

In conducting our proportionality review, this court must compare the present case with cases involving similar defendants and similar crimes. Id.; see also Terry v. State, 46 S.W.3d 147, 163-64 (Tenn. 2001). We select comparison cases only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000); see also Godsey, 60 S.W.3d at 783. This Court begins with the presumption that the sentence of death is proportionate with the crime of first degree murder. Terry, 46 S.W.3d at 163 (citing State v. Hall, 958 S.W.2d 679 699 (Tenn. 1997)). However, this presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 308, 107 S. Ct. 1756, 1775 (1987)).

In comparing this case to other cases in which the defendants were convicted of the same or similar crimes, this court looks "at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved." Id. at 164. Regarding the circumstances of the crime itself, numerous factors are considered, including the following: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or

presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164. Contemplated within the review are numerous other factors, including a defendant's: "(1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Stout, 46 S.W.3d at 706. In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Terry, 465 S.W.3d at 164. Thus, our function is not "to limit our comparison to those cases where a defendant's death sentence 'is perfectly symmetrical,' but only to 'identify and to invalidate the aberrant death sentence.'" Id. (quoting Bland, 958 S.W.2d at 665).

In the instant case, the facts at trial reveal that the Appellant entered the victims' home armed with a .22 caliber automatic rifle and fired nine shots, killing both Stanley Goodman and Terry Sue Goodman execution style. The Appellant knew both victims; thus, making it highly likely that he would be apprehended had either of them survived. The Appellant had previously made threats against Stanley Goodman. He confessed to the crime to numerous persons.

In State v. Carter, 714 S.W.2d 241 (Tenn. 1986), the jury found that the defendant's motive for the murder was to kill the victim to avoid arrest for another crime. The defendant had been planning to steal an automobile and decided upon the victim's truck. The defendant shot the victim – a stranger to the defendant and completely unsuspecting of the impending crime – and disposed of the body in a lake in an attempt to conceal the murder and to avoid arrest. The jury imposed the sentence of death after finding the (i)(6) and (i)(7) aggravating circumstances beyond a reasonable doubt.

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the death penalty was imposed and upheld for a forty-year-old defendant who murdered his estranged wife and two stepsons. Witnesses testified that for several months prior to the murder, the defendant had publicly plotted to kill his family. Expert testimony revealed that he mutilated two of the bodies shortly after the victims' deaths, and the jury concluded that the evidence was sufficient to support the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." See T.C.A. § 39-13-204(i)(5). Moreover, the jury found that the proof supported a finding that at least one motive for killing the stepsons was the threat they posed of the defendant's apprehension. See id. § 39-13-204(i)(6).

In completing our review, we need not conclude that this case is exactly like prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. State v. Thomas, 158 S.W.3d 361, 383 (Tenn. 2005). Rather, this court need only identify aberrant death sentences by analyzing whether a capital case plainly lacks

circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalty imposed by the jury in the present case is clearly not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and conclude that the sentence of death was not imposed arbitrarily. The evidence supports the jury's finding of the section 39-13-204(i)(6) statutory aggravating circumstance to the murders of Stanley Goodman and Terry Sue Goodman. Moreover, the evidence supports the jury's finding that the application of the enumerated aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. See T.C.A. § 39-13-206(c)(1). Moreover, a comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentences of death were neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the Appellant's convictions for first degree murder and resulting sentences of death imposed by the trial court.

_____
CAMILLE R. McMULLEN, JUDGE